UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————

No. 2:20-cv-4885

JOEL J. MALEK, individually and
on behalf of all others similarly situated,

**CLASS ACTION COMPLAINT**

                                        Plaintiff,

            v.

AXA EQUITABLE LIFE INSURANCE CO.,
LEONARD FEIGENBAUM, and DOES 1-1000;

Jury Trial Demanded

                                        Defendants.

**FILED VIA ECF**

——————————————————————

All facts herein are alleged upon knowledge or information and belief.  Plaintiff, by his attorneys, complaining of Defendants, set forth and allege as follows:

## NATURE OF THE ACTION

1.    AXA Equitable Life Insurance Company (hereinafter "Equitable" or "Defendant" or "Insurer") engineered a deceptive marketing conspiracy implemented by its brokers (the "Broker Defendants"), including Defendant Leonard Feigenbaum, to trick life insurance consumers into replacing their existing whole life policies into more costly Equitable universal life insurance policies that had lower rates of return and higher risk.  Such deceptive marketing is known as "twisting" and all but two states have statutes prohibiting it.

2.    An investigation by the New York State Department of Finance (the "NYSDF" or "Department of Finance") revealed that Equitable materially misrepresented the terms of its insurance products in order to induce consumers to buy them.  The NYSDF also found that Equitable systematically failed to comply with the disclosure regulations required by New York law when issuing replacement life insurance policies.  As part of its settlement with the NYSDF,

Equitable was forced to correct the materially misleading disclosures it provided to consumers with corrected disclosures that revealed Defendants' fraud.

3.     The NYSDF found that Equitable's fraud included changing the material terms of the contracts that consumers had agreed to, as well as materially deceptive disclosures. For example, the policy purchased by Plaintiff included a maximum growth of 12% per year. In fact, Equitable capped his interest growth much lower, costing him thousands of dollars.

4.     The NYSDF also disclosed that Equitable's sales and marketing materials were designed to provide incomplete disclosure of the premium requirements for Defendants' proposed universal life and variable universal life policies. Defendants concealed that the premium requirements may change based on market rates, administrative costs, and other expenses and costs of insurance. Defendant also did not disclose that, based on the guaranteed assumptions only, those policies will terminate without value after a certain number of years.

5.     The NYSDF required that Equitable replace its materially false and deceptive disclosure statements ("Disclosure Statements") with Revised Disclosure Statements that revealed for the first time that:

a.     Consumers were charged a 6% to 10% upfront premium charge against the cash values that were transferred, even though whole life policies did not have upfront premium charges;

b.     Loan Transfers would be treated as a premium payment, which would subject insureds to an 8% premium charge on the loan amount;

c.     The Broker Defendants' agent's statement section in its Disclosure Statements falsely represented that premium payment would not be required after the initial lump sum payment;

d.  The inherent costs and source of funding for the replacements, which was not disclosed, was not warranted or advisable under the circumstances; and

e.  The replacement insurance was not in the consumer's best interests.

6.  The NYSDF found that Defendants also manipulated the Disclosure Statement to withhold the surrender value of its proposed policy for universal and variable universal life insurance replacements (the "Replacement Policies"). This practice made it impossible for consumers to do a side-by-side comparison between consumers' old policy and the one that Defendants were replacing it with.

7.  The NYSDF further held that the Financial Professional Statement (or "agent's statement") section of the Disclosure Statement was materially deceptive because the Broker Defendants misrepresented that the proposed policies offered a "lower cost of insurance." This was part of Defendants' scheme to ensure that their agents did not disclose other charges including upfront premium charges, administrative costs, and other expenses of the proposed policies, as the cost of insurance was only a portion of the premium. The Department also noted that the Replacement Policies did not offer accidental death benefit and waiver of premium riders and this was not often disclosed. As part of its scheme, Equitable and the Broker Defendants stated that the client was buying a new policy with "lower cost of insurance," however the total premium for the replacing policy was higher than the replaced policy and with fewer benefits.

8.  Defendants' scheme is a nationwide conspiracy to deceive U.S. holders of life insurance policies into replacing their insurance (whether purchased from Equitable or elsewhere) with more costly, less beneficial, and riskier life insurance products. This scheme orchestrated and executed by Equitable and independent brokers resulted in a series of individual conspiracies between Equitable and each insurance broker. Equitable provided uniform and misleading

marketing materials to the brokers, incentivizing them to deceive consumers into replacing their insurance when they would be better off maintaining their existing insurance.  The primary means for this deception is through the use of pre-printed sales and marketing illustrations that deceptively "compare" the existing insurance with the replacement insurance and offer incomplete disclosure of the benefits of maintaining existing insurance.  The primary purpose of this scheme is to enable Defendant to offset its losses in other parts of the organization by charging an assortment of lucrative fees that replacement generates.

9.     Defendants' misleading disclosures concealed the true cost of the Replacement Policies from Plaintiff and the Class and caused them damage.  As a result, Plaintiff paid an upfront premium charge that he did not have to pay in his existing policies, and received a lower rate cap than promised.  Moreover, he received replacement policies with no surrender value, no accidental death benefits, or waiver of premium rider.

10.     Plaintiff and the Class could not have discovered Defendants' fraud before the NYSDF's findings enabled him to do so, because the disclosure statements provided were incomplete, and the marketing materials provided to him by the Broker Defendants were deceptive. Furthering this deception, Equitable waited too long before informing policy holders like Plaintiff that they had been provided with incomplete information years before.  The purpose of this wait was to induce policy holders to maintain their existing, deceptively marketing policies, rather than spend time and resources reinstating the policies replaced years before.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 & 1337, and 18 U.S.C. §§ 1964 & 1965.

16.    This Court also has jurisdiction over all the claims under 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"), in that "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a state different from any defendant."

11.    Venue is proper within this District pursuant to 28 U.S.C. §1391(a)(2) in that Defendants transacted substantial business within this District and within the State of New York. Plaintiff resides within this District; and the acts and practices complained of herein took place in this District.

## PARTIES

12.    At all times herein mentioned and herein relevant, Plaintiff Joel J. Malek (hereinafter "Individual Plaintiff" or "Plaintiff" or "Malek") was a resident of Nassau County, New York.  Mr. Malek purchased a rollover life insurance policy from Defendant Equitable after receiving false representations made by their insurance broker.

13.    Defendant AXA Equitable Life Insurance Company is a New York corporation with its principal place of business at 1290 Avenue of the Americas, New York, NY 10104. Defendant was at all times registered to conduct business, notably the sale of life insurance, in all 50 states, the District of Columbia, Puerto Rico, and the US Virgin Island and its products are offered in all of these.  While Equitable, like all life insurance companies, is regulated at the state level, those state regulators are in turn, all members of the National Association of Insurance Commissioners (NAIC) which provides general standardization for state life insurance regulators across the 50 states and above-mentioned territories.

14.    Defendant Leonard Feigenbaum is a registered insurance broker and independent contractor.  Defendant Feigenbaum is a resident of Nassau County, New York.

15.    Does 1–10000, who are Broker Defendants, are insurance agents and brokers that each engaged in an independent conspiracy with Equitable to twist consumers into Equitable universal life insurance policies and thereby earn substantial sales commissions.

16.    From its offices in this District, Equitable created or directed the creation of company-prepared marketing materials and company-designed sales tactics as part of a scheme to induce customers to purchase Replacement Policies.  The Broker Defendants then independently executed the scheme by using the deceptive sales materials

## ANTI-TWISTING LAWS

17.    "Twisting" is the practice of convincing a customer to replace their life insurance coverage with new life insurance coverage.  Twisting puts the customer in a worse position as far as his life insurance coverage, and is designed to induce policyholders with significant cash values in existing policies to purchase new policies, thereby depleting the cash values of existing policies and diverting these values to the insurer.

18.    Recognizing the dangers of twisting to life insurance consumers, the New York State Department of Finance has put in place a number of specific "anti-twisting" laws and regulations that insurers must follow, particularly with regard to the disclosure involved in replacement insurance.  For example, New York's statutory scheme, including New York Insurance Law Sections 2123, 2403, and 4226 and Regulation No. 60 of the New York Compilation of Codes, Rules and Regulations, Title 11, Section 51.1 et seq, addressed at length herein impose standards of conduct for insurers and brokers or agents in the event that an existing life insurance policy is being replaced by another insurance product.  Almost every other state has a similar anti-twisting statutory scheme, most of which are modelled after the National Association of Insurance Commissioners (NAIC) Model Rule.

19.     Although individual requirements vary slightly from state to state, all states identified herein have an "anti-twisting" regulation similar to that of New York Regulation 60. The majority of these "anti-twisting" regulations are based on the National Association of Insurance Commissioners (NAIC) Life Insurance and Annuities Replacement Model Regulation 613 ("MDL 613"). Formed in 1871, the NAIC helps achieve some uniformity among the states in the regulation of insurance. The NAIC is a private organization that serves as a vehicle for cooperation among state regulators, by proposing model laws for consideration by state legislatures and pooling resources through central databases. While the NAIC is a voluntary organization and cannot force state legislatures to enact laws or Departments of Insurance to follow its directives, it guides state regulation.

20.     The primary ways through which the NAIC imposes uniformity across the states in the sale of replacement insurance is by influencing states to adopt some form of MDL 613. The core principle of this Model Rule is relatively simple; insurers must provide accurate and complete disclosure regarding the replacement insurance offered in comparison to the existing insurance. MDL 613 is thus based on the same principle as Regulation 60: Insurers must provide accurate and complete disclosure to customers when selling replacement life insurance.

21.     MDL 613 utilizes a disclosure-based model that requires insurers to provide customers with notice that:

    a.  A replacement may not be in their best interest or may be a mistake.

    b.  A careful comparison may be needed between existing and replacement insurance.

    c.  Premiums may change with replacement insurance.

22.    In Section 4 of the Model Rule, "Duties of Insurers that Use Producers," the rule notes that the one of the primary duties of insurers and agents to "ascertain that the sales material and illustrations required by Section 3E of this regulation meet the requirements of this regulation and *are complete and accurate for the proposed policy* or contract." (Emphasis added.)

23.    The penalties section of the Model Rules (Section 8) references that providing deceptive or incomplete disclosures is a violation of that state's unfair trade practices law:

(a) Any failure to comply with this regulation shall be considered a violation of [cite twisting section of state's unfair trade practices act].  Examples of violations include:

(1)  Any deceptive or misleading information set forth in sales material.

## NEW YORK'S INSURANCE DEPARTMENT REGULATIONS

24.    In recommending and replacing existing life insurance coverage to Plaintiff as well as other New York residents, Defendant was required to comply with, and Plaintiff was entitled to the disclosures required by New York Insurance Department Regulation 60 (11 NYCRR 51).

25.    Reg. 60 is designed to "protect the interest of the public by establishing minimum standards of conduct to be observed in the replacement or proposed replacement of life insurance policies and annuity contracts; by making available full and clear information on which an applicant for life insurance or annuities can make a decision on his or her own best interest; by reducing the opportunity for misrepresentation and incomplete comparison in replacement situations (commonly referred to as twisting); and by precluding unfair methods of competition and unfair practices."  11 NYCRR 51.1(b).

26.    Among the information required by Reg. 60 are a series of disclosures indicating (a) the primary reasons for recommending the new life insurance policies; (b) why the existing life

insurance policies cannot meet the applicant's objectives; and (c) the advantages of continuing the existing life insurance policy without changes.  Here, the Replacement Policies were obtained in violation of Reg. 60.

27.    Under Regulation 60, Section 51.5, there are three documents that must be included in every new account application where there is a replacement of existing life insurance policies or contracts.  These are denominated "Definition of Replacement," "Disclosure Statement," and "Important Notice Regarding Replacement or Change of Life Insurance Replacement Policies or Annuity Contracts"— all of which must be completely filled out and signed by the applicant and the agent or broker.

28.    In addition, Insurance Law Section 4226(a)(1) prohibits "Misrepresentations, misleading statements and incomplete comparisons by insurers"; Section 4226(a)(5) which prohibits the making "of any incomplete comparison of any such policies or contracts for the purpose of inducing or tending to induce such person or persons to lapse, forfeit or surrender any insurance policy or contract"; and Section 4226(a)(6) which prohibits replacing the individual insurance policies . . . of an insurer by the same or different insurer without conforming to the standards promulgated by regulation by the superintendent."

29.    Section 53-3.2(b) of the New York insurance regulations, 11 NYCRR 53-3.2(b), requires, in pertinent part:

> [w]hen using an illustration in the sale of a life insurance policy, an insurer· or its producers or other authorized representatives shall not . . . use or describe non-guaranteed elements in a manner that is misleading or has the capacity or tendency to mislead [nor] state or imply that the payment or amount of non-guaranteed elements is guaranteed . . . .

## FINDINGS OF THE DEPARTMENT

30.    On May 8, 2017 the New York State Department of Finance Investigation released its report on its audit examination of Equitable's insurance marketing activities as December 2015 covering activities between 2011 and 2015.

31.    As part of the Department's review of Equitable's Market Conduct Activity, the Department reviewed a sample of Equitable's advertising files and the sales activities of the agency sales force including trade practices, solicitation and the replacement of insurance policies.

32.    In conducting its review, the Department reviewed a sample of 50 internal (*i.e.*, replacing Equitable life insurance policies) replacement policies and 50 external (*i.e.*, replacing other life insurance company's policies) replacement policies.

33.    The Department also made the following findings of fact:

    i.  The Company's universal life and variable universal life policies require a 6% to 10% charge against each premium paid by the policyholder.  In all 42 (100%) internal life replacements and in all 46 (100%) external life replacements where the cash value of the existing policy was transferred to the new policy, the Company failed to disclose in the Disclosure Statement that there would be a 6% to 10% upfront premium charge against the cash values that were transferred.  This was particularly concerning to the Department in comparisons made with existing whole life policies, as the whole life policies did not have upfront premium charges.

34.    The Department further found that Defendants concealed the value of the surrender policies:

    ii.  In 33 out of 50 (66%) internal universal life and variable universal life replacements and in 37 out of 50 (74%) external universal life and variable universal life replacements, the Disclosure Statement indicated "N/A" as the surrender value of the proposed policy.  In these instances, the Company referred the client to the illustration for the surrender values provided to consumers by AXA Advisor's agents.  The examiner also noted that by using the notation "N/A" as the surrender charge of the existing policy where the correct surrender charge should have been "0", the client was not afforded the opportunity to observe on the basis of a side-by-side comparison, what could be a significant advantage of not replacing the

existing policy. There was no justification for using the notation "N/A" as the figures were readily available in the illustration.

35.    Concerning the Replacement Policy's premium payments, the Department found:

iii.  In seven out of 50 (14%) internal universal life and variable universal life and in four out of 50 (8%) external universal life and variable universal life replacements, the agent's statement section of the Disclosure Statement indicated that premium payment will not be required after the initial lump sum payment. The agent stated on the Disclosure Statement that "the client wants to increase his death benefit without increasing annual premium." The examiner noted that in one of the seven external replacements the existing policy was actually paid-up. In all seven internal replacements and in all four external replacements, the agents did not disclose that premium requirements for the proposed universal life and variable universal life policies are subject to change based on market rates, administrative costs and other expenses and costs of insurance, as indicated in the policy illustrations. The agents also did not disclose that, based on the guaranteed assumptions only, those policies will terminate without value after a certain number of years.

iv.  In all four internal life replacements and in the one external life replacement where there was a loan balance on the existing life policy, the Company transferred the loan from the existing policy to the new policy. However, the agent did not disclose that the loan transfer would be treated as a premium payment, which would subject the insured to an 8% premium charge on the loan amount.

v.  In three of the 50 (6%) internal universal and variable universal life replacements reviewed, the Company replaced the existing policies with policies having identical face amounts and premium charges. In the agent's statement section of the Disclosure Statement, the agent indicated that the proposed policies offered a "lower cost of insurance." The agent did not disclose other charges including upfront premium charges, administrative costs, and other expenses of the proposed policies, as the cost of insurance was only a portion of the premium. The examiner also noted that the new policies did not offer accidental death benefit and waiver of premium riders. The accidental death benefit and waiver of premium riders were offered in the existing policies. As a result, the policyholder would be paying the same amount of premium for a policy that did not include an accidental death benefit and a waiver of premium rider, in addition to being subject to a new surrender charge period, which was not indicated in the Disclosure Statement as an advantage of continuing the existing policy.

36.     In sum, the Department's conclusions demonstrated that Equitable had failed in its duty to ensure that its disclosure statements consisted of full, clear and accurate information to applicants.  The Department concluded that Equitable had "violated Insurance Regulation No. 60 (2nd Amendment), 11 NYCRR Section 51.6(b)(3) and Insurance Regulation No. 60 (3nd Amendment), 11 NYCRR Section 51.6(b)(4) by failing to examine and ascertain that the Disclosure Statement was accurate and met the requirements of the Insurance Law."

37.     The Department further determined that Equitable (and the Broker Defendants, by implication) were not providing sufficient information to allow its customers to make a fair and accurate comparison of their existing policies with that of the Replacement Policies:

> The Company failed to make available full and clear information on which the applicant for life insurance could make a decision in his or her own best interests when it failed to present an accurate side-by-side comparison of the existing and proposed policies.

38.     The Department also noted that Equitable had engaged in providing inaccurate and incomplete information to customers whose existing life insurance policies were being replaced by universal life or variable universal life policies and that its agents had misrepresented the cost of purchasing the replacement policy:

> The Disclosure Statements inaccurately described transactions where a whole life policy was replaced by a universal life or variable universal life policy and in cases where the replacing policy had upfront premium charges that were not fully explained.
>
> In some instances the agent stated that the client was buying a new policy with "lower cost of insurance", however the total premium for the replacing policy was higher than the replaced policy.

## FACTS SPECIFIC TO PLAINTIFF MALEK

*39.*     In 1977, Plaintiff Malek bought a whole life insurance policy from Prudential Life Insurance with death benefit coverage of $25,000 and an annual premium of $399.  In 1987,

Plaintiff bought a second whole life insurance policy from MONY with death benefit coverage of $150,000, and an annual premium of $1750.50.

40.    In 2010, insurance agent Leonard Feigenbaum suggested that Plaintiff surrender his whole life insurance and purchase replacement Indexed Universal insurance with Equitable at a total coverage of $288,000.

41.    On or about September 29, 2010, Defendant Feigenbaum prepared and communicated a deceptive document titled "Values and Benefits," that misstated the value of the replacement policy Mr. Malek purchased.

42.    Defendant Feigenbaum sent a letter to Mr. Malek, dated December 23, 2010, touting the benefits of Equitable's new indexed universal life insurance production and stating the "recommendation obviously is to have [Malek's] new $288,000 [policy] issued as the Indexed Universal Life policy."   In this letter, Defendant Feigenbaum agreed that the interest rate (or "crediting rate") that could be earned by the policy would be 12% per annum.

43.    On or about March 7, 2011, Defendant Feigenbaum provided to Mr. Malek a materially false and misleading disclosure statement titled "Appendix 10A Insurance Department of the State of New York Disclosure Statement" that misled Mr. Malek as to the terms of his replacement policy.

44.    When Defendant Feigenbaum interacted with Plaintiff, he was acting in concert with Equitable to manipulate consumers into replacing their life insurance policies with risky, universal life insurance policies.  Defendant Feigenbaum was thus incentivized (by receiving substantial sales commissions) to provide as little disclosure as possible when recommending that his client replace their existing life insurance policies.

45.     Indeed, a search of Defendant Feigenbaum on <u>BrokerSearch</u>, an online database of insurance brokers and insurance agents listing the complaints against them, demonstrated that Defendant Feigenbaum has consistently recommended replacement insurance without providing adequate disclosures.  Of the three complaints listed, one such complaint in 2011 alleged that a consumer was misled into surrendering his existing 1989 life insurance policy for a replacement that had higher insurance costs.



Disclosure History

LEONARD ALAN FEIGENBAUM has 3 Disclosure Event(s).

Date: April 02, 2012

Category: Customer Dispute

Allegations: CLIENT ALLEGES HE WAS MISLED INTO SURRENDERING HIS 1989 VARIABLE LIFE INSURANCE POLICY FOR A 2011 TRADITIONAL LIFE INSURANCE POLICY. CLIENT FURTHER ALLEGES THAT HAD HE KNOWN HE WAS PURCHASING A POLICY WITH HIGHER INSURANCE COSTS, HE WOULD NEVER HAVE AGREED TO SURRENDER HIS OLD POLICY. CLIENT IS REQUESTING THE FIRM TO WAIVE THE SURRENDER CHARGES.

Damage Amount Requested: $9,531.48

Settlement Amount: $700.00

Broker Comment: THE FIRM AGREED TO CANCEL THE POLICY AS IF IT HAD NEVER BEEN ISSUED. LOSS TO FIRM: $28,091.07. RR FEIGENBAUM'S ERRORS AND OMISSIONS CARRIER DID NOT CONTRIBUTE TO THE SETTLEMENT. ***CORRECTION FROM PREVIOUS FILING DATED 7/10/2012*** THE FIRM AGREED TO CANCEL THE POLICY AS IF IT HAD NEVER BEEN ISSUED. LOSS TO FIRM: $700.00 RR FEIGENBAUM'S ERRORS AND OMISSIONS CARRIER DID NOT CONTRIBUTE TO THE SETTLEMENT.

46.     The Broker Defendants sought out owners like Mr. Malek who owned life insurance products with significant cash value (the policies had been held by the insured for many years) in order to "twist" them in replacing them with products that offered Equitable greater returns - and charged customers with higher insurance costs.  The Broker Defendants than used deceptive uniform sales materials provided by Equitable to convince Plaintiff and members of the Class to exchange their life insurance policies.

*The Pre-Printed Illustration*

47.     As part of a scheme with Equitable, Defendant Feigenbaum presented customers with pre-printed marketing materials provided by Equitable that were designed to manipulate customers into replacing their current life insurance with universal life insurance.  As part of this scheme, Equitable instructed the Broker Defendants to withhold disclosure in these materials concerning the risks of replacement insurance in order to induce them to purchase the replacement insurance.  Such materials are significant, because universal life insurance is a far more complex product than regular whole life insurance, and thus requires more significant disclosure in marketing to consumers who are not versed in the complexities of indexed and variable life insurance products.

48.     When presenting customers with information regarding the replacement insurance, the Broker Defendants used prepared illustrations provided by Equitable while Twisting consumers into purchasing replacement life insurance (the "Equitable Illustrations").  For example, when deciding whether to roll-over his existing policies into Equitable's universal life insurance, Plaintiff Malek was provided with the Equitable Illustrations entitled "Athena Universal Life Basic Illustration, Flexible Premium Life Insurance" purportedly prepared for Mr. Malek.[1]  This "Illustration" purported to show the benefits of replacing Mr. Malek's existing life insurance with the replacement insurance by having a column for each year (along with Mr. Malek's corresponding age) of the replacement policy along with other columns for new policy for  the annualized premium outlay, the loans/withdrawals and the "guaranteed" and "non-guaranteed columns each with sub-columns for Net Policy Amount, Net Cash Surrender Value, and Net Death Benefit.

---

[1]  Upon information and belief, Equitable's Replacement Policies were marketed under its "Athena Universal" brand.

49.     In this illustration, there was a column titled "loan/withdrawal," which was misleading because Equitable could not prepare the illustration with a withdrawal and make the benefits look as beneficial.   Thus, the column should have been entitled just "loan," not "loan/withdrawal."

50.     The Illustration was also misleading in that the illustration used an artificially inflated interest rate assumption to create the impression that the surrender value of the replacement policy would remain high when, in reality, the replacement policy would likely have no surrender value at all.   Therefore, clients were given the misleading impression that their Replacement Policies would maintain their value over a number of years.   In fact, the value of their policies would become nil in a couple of years as the interest rate assumptions utilized in the last columns were not realistic.

51.     The Illustration also is misleading in that it makes it seem as though "current charges"[2] are fixed at the disclosed rates on the document.   In fact, "current charges" can increase and do increase at will by the insurer.   This has the impression of making it seem like the non-guaranteed parts of the illustration are in fact guaranteed, when they are not.

52.     Defendant Feigenbaum, upon Equitable's instruction, violated 11 NYCRR 53-3.2(b) by failing to explain the nonguaranteed elements of the Replacement Policies and by stating and/or implying that the payment or amount of the non-guaranteed elements was guaranteed. These sales tactics are part of a top-down orchestrated scheme by Equitable to train, instruct, and incentivize its agents to downplay the risks of the non-guaranteed of universal life insurance while playing up the potential, but often illusory gains.

---

[2]  "Current Charges" include a monthly insurer's cost of insurance, a monthly per policy charge and a monthly charge for each $1000 face amount.

16

53.     Equitable also had their agents conceal the true nature of the interest rates associated with the Indexed replacement insurance policy, in particular by utilizing the illustration to imply that the interest rate assumptions were much higher than they were in reality.  Instead of being presented with accurate interest rate assumptions, Plaintiff Malek was presented with the Equitable Illustrations that deceptively utilized the S&P market index to make it seem like the policy maximum interest rate was higher than it actually was.

54.     Further, as part of Equitable's scheme, as noted above with regard to Defendant Feigenbaum's letter of December 23, 2010, Equitable instructed, trained, or otherwise incentivized or conspired with its agents to manipulate customers into believing that these artificially high interest rates were likely to materialize.

### The Materially False and Misleading Disclosure Statement

55.     Defendant Feigenbaum also presented Plaintiff Malek with a Disclosure Statement as mandated by Insurance Regulation 60.  Equitable's conspiracy demanded that such disclosure statements were left incomplete as true knowledge of the costs associated with replacement insurance would deter applicants from purchasing Equitable products.

56.     In this Disclosure statement presented to Plaintiff, the Agent's Statement section was essentially left blank.  The Agent's Statement was supposed to disclose to Mr. Malek:

     a.   The reason for recommending the new life insurance policies.

     b.   The reason why the existing insurance coverage did not meet his objectives.

     c.   The advantages of continuing the existing insurance policies.

57.     Instead, the Agent's Statement section was silent as to the advantages of continuing the existing insurance policies, key information that the Mr. Malek would need to have known before completing his purchase.

58.    In addition, the Disclosure Statement did not inform Mr. Malek that upon issuing the proposed contract, Equitable would impose a 6 to 8% premium charge on the cash released by the rollover of the existing policy into the replacement.

59.    There was also incomplete disclosure with regard to the other charges associated with the new replacement policy, including monthly administrative charges, cost of insurance charges, as well as a surrender charge; none of which existed with the existing policy.

60.    Further, the "Summary Results" page of the Disclosure Statement that Mr. Malek received was misleading in that with regard to policy premiums, it stated "policy has flexible premiums" rather than explicitly disclosing that the replacement policy had a 6 to 8% premium charge as well as other administrative costs while listing "na" as to the surrender value when it's clearly not only applicable but also a figure that should have been disclosed as a "0" for guaranteed value.

61.    In sum, the Disclosure Statement provided by Defendants to Mr. Malek was incomplete and did not allow Plaintiff to make a full comparison of the insurance policies nor understand the fees and costs associated with replacement insurance.  When Plaintiff entered into the contract to replace his existing insurance with replacement insurance, he was not provided with full disclosure nor was able to make a fair comparison between the old policies and the new.

### *Plaintiff was Deceived and Misled by Equitable and the Broker Defendants*

62.    Both the Replacement Policies and the policy Illustrations are so complex and cumbersome that they cannot be read and understood by a layperson and, indeed, are meaningless to consumers like Mr. Malek without appropriate disclosures and an explanation by someone with expertise in the life insurance industry.   This is why the Disclosure Statement is of vital importance to customers as without it, they are unable to ascertain the true costs of replacement life insurance.

63.     Equitable advised, trained or otherwise directed the Broker Defendants to leave the Agent Statement section blank.

64.     Defendants knew that the Replacement Policies and the illustrations are so complex and cumbersome that New York State law required strict adherence to its disclosure requirements, *e.g.*, New York Reg. 60.

65.     Because the Replacement Policies and the illustrations are so complex and cumbersome that they cannot be read and understood by a layperson, Equitable instructed, trained, directed or otherwise incentivized the Broker Defendants to provide incomplete disclosure to their customers.

66.     In connection with the recommendation and sales of these Replacement Policies, Defendant Feigenbaum made statements that misrepresented the "terms, benefits or advantages" of the replacement coverage and necessarily provided an incomplete comparison of the existing policies to the Replacement Policies by not providing any comparison, as was required by New York law.

67.     Upon information and belief, the majority of the "Initial Payments" or "1035 Exchange Amounts" were paid by Equitable to the agent as undisclosed commissions.  In reliance on these misrepresentations and omissions, Plaintiff and the other members of the Class purchased the Replacement Policies which were not suited to their needs and which recommendations only served to generate additional premiums and undisclosed commissions to Defendants and their agents.

## EQUITABLE'S CONSPIRACY WAS PART OF A
## PATTERN AND PRACTICE OF FRAUD

68.     New York state regulators have repeatedly found that Equitable has failed to make adequate or accurate disclosures in marketing replacement insurance.  In 2010, Equitable was fined $1.9 million for making improper disclosures when consumers bought replacement annuities and life insurance policies.    Through a regular audit completed in 2007, the New York State Department of Insurance found that between Jan. 1, 2001, and June 30, 2006, Equitable violated New York insurance laws when it failed to use product comparisons that adhere to the State's requirements.

69.     The same report also determined that when considering hypothetical rates of return, Equitable failed to use product comparisons that lower the surrender and death benefit value by the amount of the investment fund charges.  In doing so, Equitable violated New York's Regulation 60, which requires insurers to give consumers complete and accurate comparative product information when they decide to replace one contract with another.

70.     Equitable's fraudulent practices were only uncovered by a government audit.  The reason was simple: Equitable had concealed the truth from its customer such that it was impossible to tell that they had been defrauded.  Further, the practices were so lucrative for Defendants that they had no intention of ever fully disclosing the truth to consumers unless forced to do so.

71.     Rather than change their practices after the 2007 penalty, Equitable continued to engage in similar schemes to mislead customers through incomplete comparisons and deceptive marketing materials.  In fact, Equitable doubled-down on its strategy and engaged in even more deceptive and misleading practices.  This is because the surcharges the company could charge on its Replacement Policies were vital to the ongoing operation of Equitable.

72.     Equitable would secretly surcharge its universal life policyholders for investment

losses sustained, high claims experience, and exorbitant administrative costs and expenses incurred on non-universal life products sold by the Company and its affiliates, *i.e.*, property and casualty, health insurance, etc., even though the profits and surpluses from such products were not to be shared by the company's pool of universal life policyholders.

**STATUTORY TOLLING**

73.    As Defendants intentionally withheld necessary disclosures from Plaintiff and concealed the truth with regard to the replacement insurance, Plaintiff Malek was unable to determine the harm caused by the replacement insurance provided to him until the government's intervention.  There was nothing in the statements provided to him that could have made him aware of these claims.

74.    A letter dated September 6, 2019 from Equitable senior director Brian Sumutka to Plaintiff for the first-time informed Plaintiff that "you may have considered other information that was not disclosed in the original disclosure statement to you."  The September 2019 Letter informed Plaintiff that Equitable was providing a "revised" Disclosure Statement.  The letter was silent as to what new information would appear in the revised Disclosure Statement or as to what information had been withheld from Plaintiff in the original disclosure.

75.    Attached to the letter was a revised Disclosure Statement containing information that had been withheld from Plaintiff when he purchased his replacement policy in 2010.  The revised Disclosure Statement informed Plaintiff that:

> a.    Defendants were charging upfront premium charges of over $66,000 under the terms of the replacement policy, as opposed to a fixed monthly charge of just $2,150 with his 2010 existing policies.  This section had been marked with an

asterisk in the 2011 Disclosure with a footnote stating "Policy has flexible premiums."

b.  A footnote was added to this revised Disclosure Statement that informed Plaintiff that "all premiums received initial [sic] and subsequent will impose a 6 to 8% premium charge."

c.  Another footnote was added to the revised disclosure that noted that the "Guaranteed" and "Non-Guaranteed" values of the Surrender Value of the replacement insurance were "based on the selected index." Thus, for the first time, Plaintiff was informed as to the unrealistic nature of the values provided in the Disclosure Statement and in the Illustration.

76.  The next page of the Revised Disclosure contained a now fully-filled out Financial Professional statement (hereinafter "agent's statement") which had originally been left blank in the disclosure provided to him by Defendant Feigenbaum at the time of purchase. In this revised agent's statement, Plaintiff learned of the advantages of keeping his existing policies including that:

a.  The contestability and suicide clause on his existing policies had expired, which means that with the Replacement Policies (whose clauses had not expired), the insurer could challenge death benefits in the situation where the insured's suicide occurred within two years of entering into the replacement policy;

b.  The existing policy had no surrender charge while the replacement policy has a surrender charge for the first 20 years;

c.  The replacement policy contained a host of new charges that he did not incur on his existing insurance including:

    i.   A charge imposed on the premium.

    ii.   A monthly cost of insurance charge

    iii.   A monthly per policy charge and;

    iv.   A monthly charge per each $1000 face amount.

77.    The revised Disclosure Statement also contained a "remarks section"  (which had been left completely blank in the original) in which it was disclosed that "[u]nlike the current policies, which has guaranteed level premiums which will not increase, the premium requirements for the proposed policy may increase based on market rates, administrative rates and other expenses and costs of insurance.  In addition, based on guaranteed assumptions alone, the proposed policy may terminate without value."

78.    In sum, the "revised" Disclosure Statement—if it could be called that as no true original disclosure had been provided—presented Plaintiff with radically different information and perspective as to the wisdom of purchasing replacement universal life insurance.

79.    After receipt of the September 2019 letter, Mr. Malek called Equitable at the number provided in the letter and spoke to an Equitable representative regarding the revised disclosure letter.  In this conversation, Mr. Malek made clear that he would not have purchased the replacement policy had he been provided this information in 2010 and that he wanted Equitable to provide him with a written description of his options as well as the values and current growth cap rate of his policy.

80.    In response, Mr. Malek received a letter from Equitable in November 2019 informing him of receipt of his phone call and that they were providing him with the information requested with regard to values and current growth cap rate.  They never provided any such information.  Instead, the letter vaguely stated that: "Equitable is required to request Prudential

and MONY reinstating your existing coverage" without any assurance that Plaintiff would be able to obtain said existing coverage as the decision to reinstate was contingent upon MONY and Prudential's acceptance. The twenty-two pages of policy documents Plaintiff received often included unreadably small print, and did not address the 12% Maximum Growth Cap he had agreed to.

81.     The letter noted that the transfer back to the existing policy would be treated as an IRS 1035 exchange, the total account value was $82,943 and subject to change, and that Plaintiff would be responsible for additional amounts to restore his policies. Lastly, the letter noted that if MONY and Prudential did not agree to the reinstatement, Equitable would provide a credit of $3,329, an amount far less than the upfront premiums of $66,000 that Plaintiff paid when replacing his insurance with Equitable Universal Life policy.

82.     Mr. Malek wrote a letter to Equitable in December 2019, requesting that they terminate his contract based on the material misrepresentations made by Defendants, and that he wanted a refund based on the performance of the    S&P 500—the formula Plaintiff selected when he purchased the policy—and Equitable's remediation formula, as well as surrender charges. Equitable however continued to contest whether they were liable for their fraud.

## PLAINTIFF'S DAMAGES

83.     Plaintiff has paid significant costs in terms of the upfront premium cost and upfront premium payment surcharges made on his account, as well as monthly administrative fees and cost of insurance fees that were not fully disclosed in the original Disclosure Statement.

84.     Plaintiff has also been harmed by Equitable's failure to pay the crediting rates that he agreed to. Specifically, Equitable failed to pay the maximum interest crediting rate of 12% that he agreed to, but instead lower amounts per year.

85.    Plaintiff has also been harmed by having to spend time and resources calling and writing Equitable urging them to remedy Defendants' violations upon being made aware of them.

86.    Defendant Feigenbaum and the Broker Defendants received substantial commissions upon the sale of the Replacement Policies and Equitable received thousands of dollars of premiums paid under the Replacement Policies from 2010 to 2019.

## CLASS ACTION ALLEGATIONS

87.    This action is brought as a class action under Rule 23.  Plaintiff seeks certification on behalf of a class of all persons or entities living in the United States who between January 1, 2010 through the date of the commencement of this action (the "Class Period") purchased an "Athena" universal life insurance policy issued by Equitable, either directly or through the surrender (in whole or part) or lapse, or by borrowing against an existing permanent life insurance policy (the "Nationwide Class" or "Nationwide Class Members").

88.    Plaintiff also seeks certification on behalf of a sub-class of all New York residents who are members of the Nationwide Class (the "New York Sub-Class").

89.    Plaintiff also seeks certification on behalf of sub-classes of all residents of each of the states identified in the Fifth Cause of Action below, who are members of the Nationwide Class (together, the "State Sub-Classes").

90.    Collectively, the Nationwide Class, the New York Sub-Class, and the State Sub-Classes comprise, and are referred to herein as, "the Class."

91.    Excluded from the Class are Defendants, any parent, subsidiary or affiliate of any defendant, any entity in which any defendant has a controlling interest, and the respective officers, directors, employees, agents, legal representatives, heirs, predecessors, successors, and assigns of such excluded persons or entities.

92.     These uniform pre-printed illustrations and related sales material, which were prepared, approved and disseminated by Equitable, failed to disclose a host of material facts known to Defendants which would negatively impact the policy's performance, and render it impossible for the illustrated out-of-pocket annual premium payments to maintain the represented policy benefits for the stated life of the policy.  Plaintiff and the other Class Members were reasonably and actually deceived and misled into believing that upon Equitable's approval of their insurance application and policy issuance, the policy's accrued cash value—fueled by the projected interest crediting rates—would be sufficient to offset any projected increase in the cost of insurance and related policy expenses as the insured aged, and would result in substantial cash and surrender values in later years and an increasing death benefit over the life of the policy.

93.     Defendants also intentionally presented Plaintiff with incomplete or inaccurate Disclosure Statements that failed to inform prospective policyholders of the negative effects and costs of purchasing additional and/or replacement policies through the surrender or lapse of, or borrowing against, their existing permanent life insurance policies.

94.     Defendants utilized practices and marketing practices that deceptively withheld material information regarding the upfront premium charges on the replacement insurance as well as the treatment of loans from the existing policies as "premiums" subject to premium charges as well.

95.     Equitable either incentivized, caused, or directed its agents to scrimp as much as possible on required disclosures concerning the costs of replacement insurance and the material benefits of remaining with existing insurance.

96.     This action is properly brought as a class action under Rule 23 for the following reasons:

a.  The Class consists of thousands of persons and is thus so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.  There are questions of law or fact common to the Class which predominate over any questions affecting only individual members, including:

   i.  Whether Equitable deployed a scheme or artifice to deceive and engaged in a common course of business which acted to deceive or mislead Plaintiff and the other members of the Class;

   ii.  Whether Equitable engaged in deceptive and misleading acts and practices in the sale of its universal life insurance policies;

   iii.  Whether Equitable routinely failed to disclose to Plaintiff and the other members of the Class material information such as the false actuarial assumptions underlying the projected performance of the Company's universal life policies and the nature and extent of the commissions that would be earned by its agents in the sale of such life insurance policies;

   iv.  Whether Equitable and each Broker Defendant developed, encouraged and engaged in a scheme designed to sell new universal life policies to existing policyholders through the concealment of material facts;

   v.  Whether Equitable breached the terms of its universal life policies by surcharging policyholders for investment losses, high claims experience, and administrative costs and expenses sustained or incurred on non-universal life insurance products sold by the Company and its affiliates;

   vi.  Whether Equitable breached its implied covenant of good faith and fair dealing with Plaintiff and the other members of the Class or otherwise engaged in unfair,

fraudulent or wrongful business practices during the Class Period by charging additional higher premiums on universal life policies purchased by Plaintiff and the other members of the Class;

vii.   Whether Defendants, at the time of sale and thereafter, deceived Plaintiff and the other members of the Class regarding the amount of cash premiums that would be necessary to pay for the universal life policies purchased by them during the Class Period;

viii.  Whether the policy illustrations and related sales materials prepared, approved and disseminated by Equitable contained deceptive facts or omitted material facts making them deceptive relating to interest crediting rates, premiums, cash values, surrender values, policy expenses, death benefits and income payable (if converted to an annuity);

ix.    Whether the policy values, insurance costs, assumptions, mortality experience, expenses, lapse rates, interest rates and investment return projections underlying Equitable's universal life policy illustrations and related sales materials were so flawed as to cause the illustrations and other sales materials to be deceptive or misleading;

x.     Whether Equitable and the Broker Defendants failed to disclose to Plaintiff and the other members of the Class material information concerning the benefits/detriments from, and suitability and impact of, using some or all of an existing policy's cash value to purchase a new policy by means of a lapse, surrender or withdrawal/partial surrender of, or loan from, the existing policy;

xi.   Whether the costs, expenses, and other charges assessed to Plaintiff and the other members of the Class were reasonably related as required by law to the administration and management of universal life policy funds;

xii.   Whether Plaintiff and the other members of the Class were charged undisclosed upfront premium charges; and

xiii.   Whether Plaintiff and the other members of the Class have sustained damages as a result of Equitable wrongful conduct and, if so, what is the proper measure of such damages.

c.   The claims asserted by Plaintiff are typical of the claims of the other members of the Class;

d.   Plaintiff will fairly and adequately protect the interests of the Class, and has retained attorneys experienced in class and complex litigation as counsel; and,

e.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

i.   given the age of the members of the Class, many of whom are elderly and have limited resources, the complexity of the issues involved in this action, and the size of individual Class Members' claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs Equitable committed against them;

ii.   the estates of members of the Class deserve speedy and efficient adjudication and resolution of these issues;

iii.   when the liability of Defendants has been adjudicated, claims of all members of the Class can be determined by the Court;

iv.   this action will cause an orderly and expeditious administration of the Class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be insured;

v.    without a class action, the Class Members will continue to suffer damages and Equitable violations of law will proceed without remedy while Equitable continues to reap and retain the proceeds of its wrongful conduct; and

vi.   this action presents no difficulties that would impede its management by the Court as a class.

**FIRST CAUSE OF ACTION**
**For Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against Equitable)**

97.    Plaintiff repeats and realleges each and every previous allegation as if fully set forth herein.

98.    Defendant Equitable entered into universal life insurance contracts with Plaintiff and the other members of the Class replacing their existing life insurance.

99.    Defendant Equitable breached the implied covenants of good faith and fair dealing in the Replacement Policies—thereby directly and proximately causing Plaintiff and the other members of the Class damages in an amount to be determined at trial—by, inter alia:

a.    charging undisclosed premium charges and charges upon cash transfer;

b.    failing to pay the agreed-upon maximum growth percentage;

c.    failing to disclose in clear, comprehensible and unambiguous terms in the Replacement Policies and/or the Replacement Policies Illustrations that the premiums of the Replacement Policies could increase in order to maintain the

policy amounts, and/or the Replacement Policies could lapse in their entirety under certain circumstances;

d.  processing an "incomplete" application that ultimately misled and/or induced Plaintiff and the other members of the Class to purchase the Replacement Policies;

e.  engaging in a trade practice constituting a defined violation or an unfair business practices statute of the state where the class member resides;

f.  violating the various anti-twisting statutes of the states in which the class member resides;

g.  failing to ensure that the Replacement Policies were suitable for Plaintiff's and the other members of the Class's financial objectives and insurance needs;

h.  failing to disclose the benefits being sought and received by Defendants in recommending and selling the Replacement Policies;

i.  failing to fully disclose the upfront premium charges associated with the replacement policies; and,

j.  failing to disclose that the premium requirements on the replacement policies increase because of increased cost of insurance and other administrative costs.

**SECOND CAUSE OF ACTION**

**For Breach of Contract**

**<u>(Against Equitable)</u>**

100.  Plaintiff repeats and realleges each and every previous allegation as if fully set forth herein.

101.  Defendant Equitable entered into replacement life insurance contracts with Plaintiff and the other members of the Class replacing their existing life insurance with replacement insurance.

102.    Defendant Equitable breached its contractual duties—thereby directly and proximately causing Plaintiff and the other members of the Class damages in an amount to be determined at trial—by, inter alia:

a.  charging undisclosed premium charges and charges upon cash transfer;

b.  failing to pay the agreed-upon maximum growth percentage;

c.  failing to disclose to Members of the Class in clear, comprehensible and unambiguous terms in the Replacement Policies and/or the Replacement Policies illustrations that the premiums of the Replacement Policies could increase in order to maintain the policy amounts, and/or the Replacement Policies could lapse in their entirety under certain circumstances;

d.  by processing an "incomplete" application that ultimately misled and/or induced Members of the Class to purchase the Replacement Policies;

e.  by failing to disclose the benefits being sought and received by Defendants in recommending and selling the Replacement Policies;

f.  by failing to disclose that the premium requirements on the replacement policies increase because of increased cost of insurance and other administrative costs and otherwise as will be determined at trial.

### THIRD CAUSE OF ACTION
### For Violations of New York Insurance Law §4226
### (Against All Defendants)

103.    Plaintiff repeats and realleges each and every previous allegation as if fully set forth herein.

104.    Section 4226(a)(1) of the New York Insurance Law provides, in pertinent part, that no insurer authorized to do business in this state in the business of life insurance shall issue or

circulate or cause or permit to be issued or circulated any statement misrepresenting the terms, benefits or advantages of any life insurance policy.

105.    Section 4226(a)(5) of the New York Insurance Law prohibits, among other things, making "any incomplete comparison of any such policies or contracts for the purpose of inducing or tending to induce such person or persons to lapse, forfeit or surrender any insurance policy or contract."

106.    Section 4226(a)(6) of the New York Insurance Law further prohibits, among other things, "replac[ing] the individual insurance policies . . . of an insurer by the same or different insurer without conforming to the standards promulgated by regulation by the superintendent."

107.    Section 4226(d) of the New York Insurance Law creates a private right of action on behalf of individuals against those that violate Section 4226's provisions, regardless whether the policies were issued inside or outside of New York.

108.    Defendant Equitable violated Section 4226 as more fully described above.

109.    The Broker Defendants violated Section 4226 as more fully described above

110.    Absent such violations, and had he known of Defendants' unlawful twisting practices, Plaintiff would not have purchased the universal life insurance from Equitable.  Nor would any of the other consumers in the Class.

111.    As a consequence of Defendants' violations of Section 4226, Defendants have knowingly received premiums and other compensation.

112.    As a consequence of Defendants' violations of Section 4226, Plaintiff and the other members of the Class have incurred damages in the form of, among other things, improper premium costs, cost of insurance fees, lower-than-promised crediting rates, and spending time and

resources calling and writing Equitable upon learning of the violations described here.  The amount of such damages is to be determined at trial.

113.    Defendants are liable, pursuant to Section 4226(d), for (1) all such damages to Plaintiff and the Class, and (2) the amounts received from customers as premiums or other compensation under the Replacement Policies.

**FOURTH CAUSE OF ACTION**

**For Violation of New York General Business Law § 349**

**(on behalf of the New York Sub-Class)**

**(Against All Defendants)**

114.    Plaintiff repeats and realleges each and every previous allegation as if fully set forth herein.

115.    Defendants failed to comply with New York Insurance Law Sections 2123, 2403, and 4226, and Regulation No. 60 of the New York Compilation of Codes, Rules and Regulations, Title 11, Section 51.1 et seq.  These provisions impose minimum standards of conduct for insurers and brokers or agents in the event that an existing life insurance policy or annuity contract is being replaced by another insurance product.  These Insurers in New York and their agents, employees and representatives are prohibited from engaging in deceptive acts and practices pursuant to New York General Business Law § 349.  New York General Business Law § 349 prohibits deceptive acts as practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York and makes such acts and practices unlawful.

116.    Defendants' conduct, as outlined above, was egregious and directed specifically to its customers with layperson's understanding of complex life insurance products.  Defendants' conduct herein was part of a pattern and practice that was consumer-oriented, of a recurring nature, and directed at the public generally, including Plaintiff and the New York Sub-Class.

117.    Upon information and belief, Defendants were aware of the fraudulent, improper and unlawful practices of twisting and churning and violations of company policy by its agents in New York prior to and during the time of the allegations contained in this Complaint, and Defendants failed to protect the public by deterring such actions failed to warn or prevent any further similar wrongdoing.

118.    As a direct and proximate result of Defendants' violations of § 349, Plaintiff and the New York Sub-Class have been damaged as alleged herein in an amount to be determined at trial.  And Defendants are liable for exemplary and punitive damages in order to protect the public by deterring future wrongdoing, in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
**For Violations of the State Unfair Business Practices Statutes**
**(on behalf of the State Sub-Classes**
**Against All Defendants)**

119.    Plaintiff repeats and realleges each and every previous allegation as if fully set forth herein.

120.    The states identified below (hereinafter the "States") are among those which maintain an anti-twisting statute based on the National Association of Insurance Commissioners Model Rule 613.   Each of these States either retains the most current version of the NAIC model rule or a previous version of the rule that is substantially similar.   While there are superficial differences between the States' anti-twisting statutes, all retain the same basic purpose and structure and impose the same sorts of duties on insurers and insurance agents as well as the same types of penalties.

121.    These provisions impose minimum standards of conduct for insurers in the event that an existing life insurance policy or annuity contract is being replaced by another insurance

product. At a minimum, these regulations require that the insurers provide accurate disclosure to applicants who are considering replacement insurance and not engage in deceptive and misleading practices.

122. A violation of each State's anti-twisting statute constitutes a violation of that State's unfair business practices statutes in that it is a violation of the state's applicable unfair business practices statutes to engage in deceptive or misleading activity in connection with the marketing and sale of replacement life insurance.

123. Defendants engaged in a nationwide scheme to market replacement universal life insurance by providing misleading and deceptive advertisement materials such as pre-printed illustration that deceptively hid the costs of replacement insurance while making it impossible for customers to make a fair comparison between their existing policies and the proposed replacement insurance.

124. Defendants engaged in a nationwide scheme to market replacement universal life insurance by providing misleading and deceptive advertisement materials such as pre-printed illustration that deceptively hid the costs of replacement insurance while making it impossible for customers to make a fair comparison between their existing policies and the proposed replacement insurance.

125. Defendants also engaged in a national scheme to incentivize and train its agents to provide as little disclosure as possible concerning the costs and downsides of replacement insurance and why maintaining existing insurance may be in the applicant's best interests. Defendants' conduct, as outlined above, was egregious and directed specifically to customers with layperson's understanding of complex life insurance products. Defendants' conduct herein was part of a pattern and practice directed at the members of the Class.

126. By engaging in this scheme against the members of the State Sub-Classes, Defendants violated the anti-twisting statutes of the States and in turn, the applicable unfair business practices law of each State, as follows:

a. Ariz. Rev. Stat. Ann. §§ 44-1521 et seq. ("Consumer Fraud Act"), and Ariz. Rev. Stat. Ann. §§ 20-1241 et seq. & Ariz. Admin. Code § 20-6-212 (anti-twisting statute), with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200 et seq. ("Unfair Competition Law") & Cal. Civ. Code §§ 1750 et seq. ("Consumers Legal Remedies Act"), and Cal. Ins. Code §§ 10509 et seq. (anti-twisting statute), with respect to purchases in California.

c. Conn. Gen. Stat. §§ 42-110a et seq. ("Unfair Trade Practices Act"), and Conn. Agencies Regs. §§ 38A-435-1 et seq. (anti-twisting statute), with respect to purchases in Connecticut.

d. 815 Ill. Comp. Stat. 505/1 et seq. ("Consumer Fraud and Deceptive Business Practices Act"), and Ill. Admin. Code tit. 50, §§ 917.20 et seq. (anti-twisting statute), with respect to purchases in Illinois.

e. Minn. Stat. § 325F.67 ("False Statement in Advertising Act") & Minn. Stat. §§ 325F.68 et seq. ("Prevention of Consumer Fraud Act"), and Minn. Stat. §§ 61A.53 et seq. (anti-twisting statute), with respect to purchases in Minnesota.

f. N.J. Stat. Ann. §§ 56:8-1 et seq. ("Consumer Fraud Act"), and N.J. Admin. Code §§ 11:17A-2.8 et al. (anti-twisting statute), with respect to purchases in New Jersey.

g. N.C. Gen. Stat. §§ 75-1.1 et seq. ("Deceptive Trade Practices Law"), and 11 N.C. Admin. Code § 12.0601 et seq. (anti-twisting statute), with respect to purchases in North Carolina.

h.  73 Pa. Stat. Ann. §§ 201-1 et seq. ("Unfair Trade Practices and Consumer Protection Law"), and 40 Pa. Stat. Ann. §§ 625-1 et seq. & 31 Pa. Code §§ 81.1 et seq. (anti-twisting statute), with respect to purchases in Pennsylvania.

i.  Wash. Rev. Code §§ 19.86.010 et seq. ("Consumer Protection Act"), and Wash. Admin. Code 284-23-400 et seq. (anti-twisting statute), with respect to purchases in Washington State.

127.  Upon information and belief, Defendants were aware of the fraudulent, improper and unlawful practices of twisting and churning and violations of company policy by its agents in the various States prior to and during the time of the allegations contained in this Complaint, and failed to protect the public by deterring such actions and to warn or prevent any further similar wrongdoing.

128.  As a result, Defendants are liable to the members of the State Sub-Classes, to the extent provided for by each State's law, for actual and statutory damages, as well as exemplary and punitive damages in order to protect the public by deterring future wrongdoing, in amounts to be determined at trial.

## SIXTH CAUSE OF ACTION
### For Unjust Enrichment
### (Against Broker Defendants)

129.  Plaintiff repeats and realleges each and every previous allegation as if fully set forth herein.

130.  The Broker Defendants—Defendant Feigenbaum, and Defendant Does—individual insurance agents, derived substantial, unjustified and exorbitant sums in the form of commissions for themselves at the expense of Plaintiff and the other members of the Class.

131.    As a result of Defendants' misconduct, Defendants have been unjustly enriched at the expense of Plaintiff and the other members of the Class.

132.    It is against equity and good conscience for Defendants to retain the sums gleaned from the recommendation and sale of the Replacement Policies.

**SEVENTH CAUSE OF ACTION**

**For Racketeer Influenced and Corrupt Organizations Act**

**(Civil Remedies)**

**<u>(Against All Defendants)</u>**

133.    Plaintiff repeats and realleges each and every paragraph set forth above as though fully set forth herein.

134.    Plaintiff is a natural person, and thus is a "person" as that term is defined by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1961(3).

135.    Equitable is a corporate entity, and the Broker Defendants are natural persons, thus are "person[s]" as that term is defined by RICO, *see* 18 U.S.C. § 1961(3).

**The Enterprise**

136.    Equitable and each of the Broker Defendants are distinct groups of persons, such that:

    a.    Equitable and each of the Broker Defendants constitute a series of distinct individual "enterprises"—one enterprise per Agent Defendant—as that term is defined by RICO, *see* 18 U.S.C. § 1961(4); or, in the alternative,

    b.    Equitable and the Broker Defendants constitute a distinct "enterprise." Each Defendant is employed by or associated with each enterprise (the "Enterprises").

137.    Equitable and each of the Broker Defendants, formed distinct associations-in-fact pursuant to RICO, *see* 18 U.S.C. § 1961(4).

138.    The purpose of each Enterprise is to "twist" Plaintiff and the other members of the Class into purchasing replacement life insurance policies that are riskier, more expensive, and or lower return than their previous life insurance policies in order to extract money from Plaintiff and the other members of the Class.

139.    The fundamental goal of each Enterprise is effectuated as follows: (1) Equitable produces deceptive sales and marketing and disclosure materials; (2) each Agent Defendant communicate these deceptive materials to members of the Class in order to twist them into purchasing Equitable's replacement policies; (3) money is thus extracted from the Class members by having Class members pay money from their banks, by means of wire, to Equitable; and upon information and belief; (4) the Broker Defendants are compensated by commission of the replacement policies sold.

140.    The relationships between the participants in the Enterprise are longstanding and ongoing.

141.    The Enterprise has for many years—but, at the very least, since 2010—been engaged in, and continues to engage in, activities that affect interstate commerce.  The Enterprise, which is in violation of RICO, has been, and remains, longstanding, and continuous, and open ended.

**Pattern of Racketeering Activity: Mail Fraud, Wire Fraud, and Bank Fraud**

142.    Defendants, individually and collectively, through their participation in the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

143.    Defendants, acting individually and as participants in the Enterprise, have devised and perpetuated a scheme to deceive life insurance purchasers, and to obtain money or property

through false or fraudulent pretenses and representations. This scheme includes, but is not limited to, the following acts:

a.  participating in the preparation of deceptive marketing materials and disclosure documents required by state insurance law;

b.  disseminating these deceptive marketing and disclosure materials to consumers and members of the Class by use of the mails, including electronic mail, with the purpose of fraudulently twisting them into purchasing more expensive and risky replacement policies;

c.  using the interstate mails and wires to receive their fraudulently obtained gains; and

d.  Committing bank fraud by fraudulently obtaining moneys within the possession of U.S. banks.

144.    Defendants, acting individually and as participants in the Enterprise, have made fraudulent misrepresentations on specific occasions, including the following:

a.  On or about September 29, 2010, Defendant Feigenbaum prepared and communicated a deceptive document titled "Values and Benefits," that materially misstated the value of the replacement policy Mr. Malek purchased;

b.  On December 23, 2010, Defendant Feigenbaum sent a letter to Mr. Malek touting the benefits of Equitable's new indexed universal life insurance production and stating the "recommendation obviously is to have [Malek's] new $288,000 [policy] issued as the Indexed Universal Life policy";

c.  On or about February 28, 2011, Defendant Feigenbaum provided to Mr. Malek a materially false and misleading disclosure statement titled "Appendix 10A

Insurance Department of the State of New York Disclosure Statement" that misled Mr. Malek as to the terms of his replacement policy.

145. Defendants, acting individually and as participants in the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew that the mails and wires would be used, in furtherance of the fraudulent scheme as described above. Namely:

a. Each year from 2013 through 2019, Equitable sent Mr. Malek, and upon information and belief other members of the Class, deceptive account statements designed to conceal the true value of their replacement life insurance, with these statements being mailed interstate from locations including an Equitable facility in Charlotte, North Carolina;

b. Defendants used the interstate mails or wires to receive the moneys from Mr. Malek in order to purchase the replacement life insurance;

c. Defendants used the interstate mails or wires to conceal their scheme, including correspondence that Equitable senior director Brian Sumutka sent Plaintiff from an Equitable office in Charlotte, North Carolina; and,

d. Defendants have used the interstate mails and wires on thousands of other occasions that Plaintiff cannot identify presently, but that are known to Defendants, to extract moneys from the Class.

146. Defendants have used the mails and wires in connection with every replacement life insurance policy that they fraudulently sold to members of the Class, and each such use has furthered the fraudulent scheme and enabled Defendants to take money and/or property from Plaintiff and the other members of the Class through misrepresentations and false pretenses.

147.    Upon information and belief, Defendants each have specific knowledge that the mails and wires have been, and are being, utilized in furtherance of the overall purpose of executing the fraudulent scheme, and/or that it was reasonably foreseeable that the mails and wires would be so used, because moneys would be transferred from the financial institutions offering their old life insurance policies to Equitable, as well as additional moneys paid by members of the Class. Notably, it would be impossible for a Class member to buy replacement life insurance without rolling over value from their previous life insurance by use of the interstate mails or wires.

148.    Further, the Enterprise has engaged in bank fraud.  Defendants, acting individually and as participants in the Enterprise, have obtained moneys and/or other property under the custody or control of a financial institution by means of misrepresentations and fraudulent pretenses, in furtherance of the scheme as described above, as the moneys used to underlie the old policies were in control of U.S. Banks.  Namely, each month, for almost a decade, Defendants sent account statements with the knowledge and intent to receive payments of moneys that were in the custody and control of U.S. banks, and receiving and processing those payments from U.S. Banks.

149.    Each of the thousands of uses of the mails and wires, and of instances of improperly obtaining control of moneys and/or other property under the custody or control of financial institutions, that occurred in connection with the fraudulent scheme as described above, spanned a period of at least five years, and constitutes a separate instance of, respectively, mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344, and thus is also a predicate act, which acts, taken together, constitute a "pattern of racketeering activity" for the purposes of 18 U.S.C. §§ 1961(1), 1961(5) & 1962.

150.    The acts of racketeering activity that occurred in connection with the fraudulent scheme as described above took place after the effective date of RICO, 18 U.S.C. § 1961 et seq., and on countless occasions over a substantial time period within ten years of each other.  These acts of racketeering are an ongoing part of Defendants' regular way of doing business.  The predicate acts have been, and will be, repeated over and over again.

**Relationship of the Pattern of Racketeering Activity to the Enterprises**

151.    As detailed above, the purpose of the Enterprises are to twist consumers into replacing their existing life insurance policies into riskier, more expensive policies with lower rates of return and more risk.

152.    The pattern of racketeering activity described above is integral to the fraudulent scheme that Defendants perpetuate.  Without engaging in mail and wire fraud, Defendants would be unable to secure default judgments against their victims.  Without engaging in bank fraud, Defendants would not have received the substantial premium payments they charged, which were in the custody of U.S. banks.

153.    Defendants, individually and as participants in the Enterprises, have each conducted or participated, directly or indirectly, in the conduct of the Enterprises' affairs through the pattern of racketeering activity described above.  As such, each Defendant has violated 18 U.S.C. § 1962(c).

154.    In addition, each Defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including through the numerous predicate acts of mail, wire, and bank fraud as described above, and has thus violated 18 U.S.C. § 1962(d).

155.    As a direct and proximate result of the RICO violations described herein, Plaintiff and the other members of the Class have suffered considerable injuries. They have been deprived

of accurate disclosures that they were entitled to by state statute. They have lost money in the form of additional fees and lower rates of return. These extreme and unjust consequences of Defendants' improper conduct in violation of 18 U.S.C. § 1962(c) & (d) amount to injury to property of Plaintiff and the other members of the class within the meaning of 18 U.S.C. § 1964.

156.    Defendants' misrepresentations in required statutory disclosures and other sales and marketing materials caused concrete injury to the property of Plaintiff and the other members of the Class. As a result, the actions of Defendants in violation of 18 U.S.C. § 1962(c) & (d) have caused Plaintiff and the other members of the Class to suffer damage to their property within the meaning of 18 U.S.C. § 1964.

157.    Defendants' conduct has involved, and continues to pose, a threat of long-term criminality, as it is believed to have commenced more than a decade ago, and has continued through to the present. The pattern of racketeering as described above has been directed towards tens, if not hundreds, of thousands of persons, including Plaintiff, and this pattern has spanned many years.

158.    For the violations of 18 U.S.C. § 1962 described herein, Plaintiff and the other members of the Class are entitled to recover compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, by reason of, as cause of and in consequence of the misconduct engaged in by Defendants in the handling of Plaintiff's accounts and monies, and pursuant to the Causes of Action set forth above and the law identified therein, Plaintiff requests:

(i)     compensatory and/or recessionary and other damages in an amount to be determined at trial;

(ii)    interest from the date of loss to the date of the award and payment of final judgment herein;

(iii)   reasonable attorneys' fees;

(iv)    costs, expert and witness fees; and

(v)     for such other further and different relief as to the Court seems appropriate and just.

## **JURY DEMAND**

Plaintiff demands a trial by jury.


Dated:      New York, New York
            October 9, 2020

                                          **FRANK LLP**

                                          By:  __/s/ Gregory A. Frank____
                                          Gregory A. Frank (GF0531)
                                          Marvin L. Frank (MF1436)
                                          Asher Hawkins (AH2333)
                                          305 Broadway, Suite 700
                                          New York, New York 10007
                                          Tel: (212) 682-1853
                                          Fax: (212) 682-1892
                                          gfrank@frankllp.com
                                          mfrank@frankllp.com
                                          ahawkins@frankllp.com

                                          *Attorneys for Plaintiff and the Class*